[L. A. No. 10625. In Bank.—March 30, 1931.]

SOUTHERN CALIFORNIA TELEPHONE COMPANY (a Corporation), Respondent, v. COUNTY OF LOS ANGELES, Appellant.

Everett W. Mattoon, County Counsel, and W. Sumner Holbrook, Jr., and Gordon Boller, Deputies County Counsel, for Appellant.

Pillsbury, Madison & Sutro, Lawler & Degnan, Alfred Sutro and Eugene M. Prince for Respondent.

LANGDON, J.—This is an appeal from a judgment of the Superior Court of Los Angeles County.

Southern California Telephone Company and Pacific Telephone and Telegraph Company, operating in and around Los Angeles County, brought actions against the county to recover taxes paid under protest. Five actions were brought, in all of which judgments were rendered for the plaintiffs. The essential facts in each case are substantially the same, and the single question of law presented in each is identical. They were accordingly consolidated on appeal and will be considered together in this opinion.

In each of the cases the plaintiff owned land upon which it was constructing a building to be equipped and used as an exchange building, a part of its telephone system. The work of construction proceeded with due diligence, and the

buildings were eventually completed and are now in operation. However, at noon on the first Monday in March, 1925, none of the buildings had as yet been completed. Plaintiffs listed said buildings in their return to the state board of equalization as "operative property". Upon the protest of the county assessor, the state board held that the property was "nonoperative", and it was thereupon assessed by the county.

The question presented by the record is whether the property was subject to taxation by the county. In order to discuss this point it is necessary first to examine the statutes and Constitution of this state, which set forth the basis upon which such public utilities are taxed. The present system of taxation of public utilities in California is the result of a constitutional amendment adopted in 1910 after an exhaustive study of defects in the former method had been made by a legislative commission. This court has on several occasions reviewed the history and described the operation of this system. (See *San Francisco* v. *Pacific Tel. & Tel. Co.*, 166 Cal. 244 [135 Pac. 971]; *Pacific Gas & Elec. Co.* v. *Roberts*, 168 Cal. 420 [143 Pac. 700]; *Pullman Co.* v. *Richardson*, 185 Cal. 484 [197 Pac. 346].) The underlying theory is clearly set forth in *San Francisco* v. *Pacific Tel. & Tel. Co., supra*, where the court said (p. 247): "The constitutional amendment worked a radical change in the system of taxation in this state. Broadly speaking, the purpose of the change, as is well known, was to divide the subjects of state and local taxation by imposing upon persons and corporations engaged in certain callings—those of public service corporations, insurance companies, banks and trust companies—the obligation to pay certain taxes to be applied exclusively to state purposes. At the same time, the persons engaged and the property employed in these callings were, to a greater or less degree, to be free from the burden of local taxation."

The said constitutional amendment (Cal. Const., art. XIII, sec. 14), reads in part as follows: "Taxes levied, assessed and collected as hereinafter provided upon . . . telephone companies . . . shall be entirely and exclusively for state purposes, and shall be levied, assessed and collected in the manner hereinafter provided . . . all telegraph and telephone companies . . . shall annually pay to the state a tax upon their franchises . . . poles, wires, pipes . . . and other prop-

erty, or any part thereof *used exclusively in the operation of their business in this state,* computed as follows: Said tax shall be equal to the percentages hereinafter fixed upon the gross receipts from operation of such companies . . . within this state.'' (Italics ours.) The scheme of taxation thus provided by the Constitution is elaborated in the Political Code, which restates the constitutional provision that all telegraph and telephone companies shall annually pay to the state a tax upon their property ''used exclusively in the operation of their business in this state''. (Cal. Pol. Code,. sec. 3664a.) The code then defines ''operative property'' of telegraph and telephone companies as ''The franchises, rights of way, poles, wires, pipes, conduits, cables, switchboards, telegraph and telephone instruments, batteries, generators, and other electrical appliances, and exchange and other buildings *used* in the telegraph and telephone business and so much of the land on which said buildings are situate as may be required for the convenient *use* and occupation of said buildings.'' (Italics ours.) It is also provided that ''property of the classes mentioned in this section owned by a company constructing a new . . . telegraph or telephone system . . . no part of which new road, line, plant or system is in operation, and the same classes of property when held by an operating company solely for the construction of a new . . . telegraph or telephone system . . . and not to be used for betterments or additions to roads, lines, plants or systems already under operation, shall not be considered operative property and shall be subject to assessment and· taxation for county, municipal, and district purposes. Any part of such property of any company mentioned in this section shall be classed and assessed as operative property when the state board of equalization shall determine that such property is rendering a substantial public service.'' (Cal. Pol. Code, sec. 3665b.) ▉ It is apparent from an examination of these provisions that public utilities are not exempt from property taxes; the tax levied upon gross receipts is a substituted tax, intended to be the equivalent of a tax on the property, and only differing from a tax directly on the property by reason of the fact that a different method of computation is employed. (See *San Francisco* v. *Pacific Tel. & Tel. Co.,* 166 Cal. 244 [135 Pac. 971]; *Pullman Co.* v. *Richardson,* 185 Cal. 484 [197 Pac. 346].)

The application of these constitutional and statutory provisions to property of the class involved in the instant case, that is, property under construction, presents a new question to this court. Nevertheless, certain controlling principles have been settled by prior decisions. We have heretofore held that the provisions of the Political Code must be subordinated to the Constitution. In the words of the court in *Lake Tahoe Ry. etc. Co.* v. *Roberts,* 168 Cal. 551, 556 [Ann. Cas. 1916E, 1196, 143 Pac. 786, 788] : "If the definition is in harmony with the language of the Constitution, it does not affect the discussion hereinbefore had. If the definition does violence to the language of the Constitution, to that extent it cannot be upheld . . . " This statement occurs with reference to the term "operative property" which is present in the code but not in the Constitution. It therefore follows that the definition of "operative property" of utilities can only be acceptable if the property included in the definition is property "used exclusively in the operation of their business" as provided in the Constitution.

In *Lake Tahoe Ry. etc. Co.* v. *Roberts, supra,* the court discusses the method of interpreting these provisions, and points out that the words "used exclusively in the operation of their business" have a plain and obvious meaning. It was therefore held that property used only partially in the business was subject to local taxation. In *Transcontinental Tel. Co.* v. *Neylan,* 34 Cal. App. 379 [167 Pac. 541], a corporation had been formed to engage in a public service business, but had not yet rendered such service. The court said (p. 382) : "It is conceded that it has not engaged in any public service, and until it does so engage all of the property owned by the company is nonoperative property." In *San Diego etc. Ry. Co.* v. *State Board of Equalization,* 165 Cal. 560, 565 [132 Pac. 1044, 1047], the following appears: "By that subdivision it is provided that the part of the new road which is in actual use by any company is 'deemed to be in operation' so as to justify its classification as operative property, as soon as it offers and renders service to the public for compensation." In *San Bernardino* v. *State Board of Equalization,* 172 Cal. 76, 79 [155 Pac. 458, 460], the court said: "The measure of the taxing power of the local authorities, applied in all of the cases, is not the *quality* or the *nature* of the property so much as its *use.*" It may readily be con-

ceded that none of these decisions deals with facts similar to those involved herein, but they indicate an interpretation of the words "operative" and "used exclusively in the operation of their business" to mean an *actual use* of the property. It may also be observed that other states, in dealing with tax exemptions, have interpreted the words "used exclusively" to require an actual use. (See *Washburn College* v. *Commissioners of Shawnee*, 8 Kan. 233; *Mullen* v. *Commissioners of Erie County*, 85 Pa. St. 288 [27 Am. Rep. 650]; *Institution of Holy Angels* v. *Borough of Fort Lee*, 80 N. J. L. 545 [77 Atl. 1035].) This last group of decisions may, however, be distinguishable on the ground that the rule requiring a strict construction of tax exemptions does not apply to the gross receipts tax, which is not an exemption, and which, it has been held, should be given a liberal construction. (*San Bernardino* v. *State Board of Equalization, supra.*)

Nevertheless, it is not apparent to us how, under any construction, the words "used exclusively in the operation of their business" can possibly include property which is neither used nor available for use in such business. Of course, it cannot be doubted that it is the duty of a utility to plan and prepare for emergency and future needs of its business; and we are disposed to give a broad interpretation to the constitutional provision. No one would seriously doubt that extra equipment for replacement purposes or for emergency use is property "used" by the utility, even though on the taxable date it was not in use, and even though at that date it had never been actually placed in use. And the same is true, we think, of necessary additions or betterments when the same are completed. The reason for this is clear enough. It is necessary that this property be on hand when needed, and it is available for use at any time. It is in the same classification as property normally in use, but temporarily out of use, which has been held to come within the meaning of an "actual use" provision. (*Seaside Home* v. *State Board of Taxes*, 98 N. J. L. 110 [118 Atl. 704].) It was never intended that local assessors should minutely scrutinize the entire system of the utility to select and tax locally isolated parts thereof which on the tax date or during the taxable year had performed no actual service. We accept the proposition that property which is necessary for the efficient

operation of the business, *and is available for use,* is operative property whether actually placed in use or not.

■ The properties involved herein come within an entirely different classification, for they are neither used nor available for use in the business. In all of the other types of property which we have mentioned, the moment the need arises, the property is ready to be used. Here, however, the property cannot be called upon until its completion, and this fact is, we believe, fatal to the claim that it is operative property. Viewing it in the light of the constitutional requirement, the uncompleted building is in exactly the same position as a bare piece of land purchased and held with the intention of constructing a building thereon. It is admitted by plaintiff that such land is taxable locally. But why is it so taxed? Simply because (1) it is not used in the business, and (2) it is not available for use in the business. The mere fact that it is *intended* to be so used is admittedly immaterial. The Constitution is not concerned with mere intention to use. And we could hardly find a more appropriate analogy to the situation presented by the instant case, that of an uncompleted building. (1) It is not used in the business; (2) it is not available for use in the business. It is intended to be so used, but this is, as we have seen, admittedly immaterial.

This conclusion is not weakened by the decisions from New Jersey and Minnesota upon which plaintiff places reliance. These decisions are to the effect that under certain circumstances property held for a public service business or being diligently prepared for use in such business was exempt from local taxes, under a system of taxation similar to our own. The New Jersey statute, however, exempts "property used for railroad and canal purposes", and the court said in *Mayor etc. of Jersey City* v. *Board of Equalization,* 74 N. J. L. 382 [65 Atl. 903]: "The property was in the possession of the railroad company, who were using it for that purpose alone. It is true that the company was not yet transporting passengers or freight as a common carrier. The actual transportation of freight and passengers, however, is not the only use to which railroad property is devoted. *The use of the property for preparation for railroad use . . . is as much a use for railroad purposes as is transportation itself.*" (Italics ours.) This is a possible interpretation of the New Jersey statute, but it could not be applicable to our

own law. It may be correct to say that property being diligently constructed for railroad purposes is being used for such purposes, but it certainly could not be said that it was being used *in the operation of the business*. The New Jersey statute is obviously much broader than our own. In spite of this fact, however, it may be observed that the case just discussed was reversed by the Court of Errors and Appeals (74 N. J. L. 753 [67 Atl. 38]), on other grounds. The case of *Philadelphia etc. R. Co.* v. *Woodbridge Township*, 91 N. J. L. 180 [102 Atl. 392], involved property consisting of railroad ties which were in a creosoting plant and which, when creosoted, were to be immediately used. The court said: ''That the ties in question were not actually in use for railroad purposes on the taxing date is apparent from what has already been stated. . . . Since the decision by this court in 1892 of the case of *United New Jersey Railroad & Canal Co.* v. *Jersey City,* 55 N. J. L. 129 [26 Atl. 135], it has been consistently held . . . that property owned by a railroad corporation, *which has been acquired and is held for a railroad use* to which it is intended to be subjected in the near future, is property used for railroad purposes within the meaning of the railroad tax law, although such use has not actually been begun . . . '' Again we have a construction of the term ''railroad purposes'' which is much broader than the language of our Constitution; but the case is also distinguishable on its facts, since it appears that the court considered the ties to be in a condition which made them practically available for immediate use when needed. The Minnesota cases are plainly not in point, for they are decided under a statute which refers to ''property *owned* or operated for railway purposes''. Under such a statute it is possible to say that ''while the necessary process of conversion of mere land into an operated railroad is being thus carried forward the land is presently devoted to railroad purposes in contemplation of law''. (*Minneapolis Transfer Co.* v. *District Court,* 68 Minn. 242 [71 N. W. 27, 28].) Under our statute, of course, mere ownership of the property for the purposes is not sufficient; the test is use in the operation of the business.

In attempting to solve problems of this sort, it is easy to fall into error by considering the possible effect of the tax on the service offered by the utility to the public. The

extent and nature of such service is subject to the control of the Railroad Commission, and the cost of additions and betterments is something for which the utility receives due credit in determining its rates. This tax cannot be considered a hardship on the utility because it is fundamental that there is no exemption intended by the Constitution, but merely a substitution. The gross receipts tax simply separates state and local taxation, but the theory of the tax, as with other taxes, is that all property of the utility, whether operative or nonoperative, shall be taxed either by the state or by the local subdivision. The method of the gross receipts tax is obvious: that part of the property of the utility which is in use and which thereby contributes to the earnings, is taxed by and through the gross receipts tax; and that part which is not in use and thereby does not contribute to the earnings, is taxed locally. In this way, all of the property is taxed by either the state or local government. It is a basic principle of the system that gross receipts furnish a standard of measurement by which operative property may be taxed, and a method had been devised of evaluating the property of the utility by calculations based upon gross receipts. As said in *Pullman Co.* v. *Richardson,* 185 Cal. 484, 504 [197 Pac. 346, 354] (quoting from the report of the legislative commission): " . . . it is highly important to discover a practical method for determining whether the burden of a tax which it is proposed to impose upon the gross earnings of a given class of corporations is the equivalent or not of a tax which might be levied under an *ad valorem* plan. Such a method has been devised by this commission. By the application of this method we can ascertain what rate of tax on the gross earnings is the equivalent of a given tax rate on the property and *vice versa.*" It must be plain that if property which does not contribute to the gross receipts is nevertheless exempted from local taxation, it escapes taxation altogether, and the theory that the gross receipts offer a means of determining what is a fair tax on the property, breaks down completely. We have gone so far as to say that property completed and available for use contributes, in a sense, to the gross receipts; and we have also given due regard to the practical complications which would arise in attempting to separate such property from property in actual, continuous use. But we should not be inclined to carry this practical

view to the extent of nullifying plain language in the Constitution, and destroying the object sought after by the framers of the system. Property which is not in use or available for use cannot, by any stretch of the imagination, be said to contribute to the earnings. We therefore conclude that neither the spirit nor the letter of the law sanctions the immunity from local taxation claimed by plaintiff in this case. It follows that the judgment of the lower court should be and is hereby reversed.

Richards, J., Shenk, J., Waste, C. J., Preston, J., Curtis, J., and Seawell, J., concurred.