[No. E000231. Fourth Dist., Div. Two. May 2, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY DEAN BLANKENSHIP, Defendant and Appellant.

[No. E001175. Fourth Dist., Div. Two. May 2, 1985.]

In re ANTHONY DEAN BLANKENSHIP on Habeas Corpus.

844

COUNSEL

Richard D. Emmot, under appointment by the Court of Appeal, for Defendant and Appellant and Petitioner.

John K. Van de Kamp, Attorney General, John W. Carney and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

RICKLES, J.—Defendant Anthony Dean Blankenship was convicted by jury verdict of robbery (Pen. Code, § 211) and attempted second degree murder (Pen. Code, §§ 187-189, 664). As to each offense, allegations of firearm use (Pen. Code, § 12022.5) and infliction of great bodily injury (Pen. Code, § 12022.7) were found to be true. An allegation of a prior serious felony conviction (Pen. Code, § 667) was bifurcated, tried to the court, and found to be true. Defendant was sentenced to state prison for a term of 19 years.

Defendant has appealed from the judgment and has also filed a petition for writ of habeas corpus which has been consolidated with the appeal. The only contention on appeal is that the trial court erred in excluding evidence that a third party orally confessed to the crimes of which defendant was convicted. The writ petition is based on a written declaration by the same third party confessing to the crimes.

## FACTS

Our statement of facts is based on the evidence received at defendant's trial.

Catherine Long, age 59, was the owner of a gas station in Lucerne Valley. On January 31, 1983, she opened the station at 7 a.m. Defendant was her first customer, arriving at approximately 7:30 a.m. in a blue Ranchero-type pickup with one red toolbox and one blue toolbox. Long recognized defendant because she had seen him about 50 times either as a customer of the gas station or as an employee working at the Country Kitchen. She knew defendant's last name only. In November or December of 1982, after a period of some months in which Catherine Long had not seen defendant, he had come to the gas station and asked if she remembered him. He had told her he was looking for work.

Defendant pumped $19.25 worth of gas into his vehicle. Catherine Long asked defendant if he was working and he said he was. Defendant was wearing tan corduroy pants and a tan jacket. Defendant asked for Marlboro 100 cigarettes. After looking in the office, Long told defendant she only had regular Marlboros. Defendant agreed to take them and followed Long into the office. When she told defendant what he owed, defendant pulled a pistol from his right pocket and said: "Mrs. Long, go sit in the chair." She sat down and held the leash of her 16-month-old German shepherd, a friendly dog which sometimes jumped on people. Defendant removed $60 in currency from the cash register and asked if there was more. "I don't know," she said. Defendant opened a small suitcase on a shelf under the cash register and removed an additional $150 in currency. Defendant then raised the pistol and fired once. The bullet struck Long in the left temple. She fell motionless to the floor.

Catherine Long may have passed out briefly. She waited until she thought defendant must have gone, then telephoned the sheriff's office. The call was received at 8:05 a.m. Sheriff's deputies arrived at the gas station within a few minutes. While waiting for the ambulance to arrive, the deputies obtained a description of defendant and his vehicle from Long. At that time she was unable to remember defendant's name but one of the deputies recognized defendant from the description.

At approximately 10 a.m., defendant's vehicle, a blue 1968 Ranchero with blue and red toolboxes, was spotted by aircraft at a residence two miles from Catherine Long's gas station. Defendant was inside the residence and was arrested. He waived his *Miranda* rights and told the deputies about his movements that morning. He said he went to a market at 8:15 or 8:30, then

to Catherine Long's station where he bought $19.25 worth of gas and cigarettes, after which he went to his own residence, then to the residence where he was arrested. He consented to a search of the Ranchero. Nothing was seized from the car although two packages of Marlboro cigarettes were observed in the glove box.

At 12:48 p.m., defendant's hands were tested for gunshot residue. Later analysis of the swabs revealed high levels of antimony and barium consistent with having fired a .22 caliber pistol within the preceding six hours.

Defendant was booked into jail. In his pockets were found $25 in currency and a single live round of Federal .22 caliber ammunition. An expended cartridge of the same caliber and brand was found in the office of Catherine Long's station. Defendant was wearing a blue vest and blue jeans.

A photograph of defendant taken at the booking was placed in a display card with approximately nine similar photographs. At 2 p.m. the display card was shown to Catherine Long at the hospital. After two or three seconds she pointed to defendant's photograph. She remembered his name was Blankenship and said he was the one who shot her.

On the following day, sheriff's deputies searched the trailer where defendant had been living. They seized a tan jacket, about 35 rounds of Federal .22 caliber ammunition, and a box for a Sterling .22 caliber auto-loader pistol.

Defendant's vehicle was stored in a privately owned impound yard. On February 4, the owner's son happened to look under the hood to see whether anything was missing because there had been thefts from the yard. He noticed the top of the air cleaner was loose. When he removed it, he found a roll of currency wrapped in aluminum foil. The discovery was reported to sheriff's deputies who counted the currency and found it amounted to $185. A report of the discovery was written but was somehow lost, the loss being discovered five months later, shortly before defendant's trial was scheduled to begin.

The bullet which struck Catherine Long fractured the zygomatic arch (the bone between cheek and ear) in many places and also fractured the upper portion of the lower jaw at the joint. There was no brain damage but there was some damage to a facial nerve. Catherine Long was hospitalized from January 31 to February 7 and returned to the hospital on February 22 for an operation in which the bullet was removed. The bullet proved to be consistent with the Federal .22 caliber ammunition found in defendant's pocket.

I

Before defendant's trial began, the prosecutor requested a hearing to determine the admissibility of evidence purportedly showing the charged offenses were committed by a third person named Gary Hahn. The prosecutor said defendant was intending to call Hahn as a witness and a hearing was necessary to determine whether Hahn would claim the privilege against self-incrimination. The prosecutor said defendant was also intending to introduce hearsay statements allegedly made by Hahn and a hearing was necessary to determine whether they should be excluded under Evidence Code section 352. The court ruled that a hearing would be held before introducing any evidence regarding Gary Hahn's possible guilt of the charged offenses.

The trial commenced with Catherine Long testifying as the prosecution's first witness. At the beginning of cross-examination, defense counsel showed the witness a photograph, later identified as a photograph of Gary Hahn, and asked: "Do you recognize this individual?" When Catherine Long answered in the affirmative, defense counsel asked who it was and the witness answered: "Dean Anthony Blankenship." On redirect the witness qualified her identification.[1]

Presentation of the prosecution's case-in-chief was interrupted for a hearing out of the jury's presence at which Gary Hahn was examined under oath. When questioned about the crimes with which defendant was charged and about his purported confession, Hahn invoked the privilege against self-incrimination. The court ruled that defendant would not be permitted to call Hahn as a witness in the trial, citing *People* v. *Johnson* (1974) 39 Cal.App.3d 749 [114 Cal.Rptr. 545].

Defense counsel then made an offer of proof, saying defendant would testify Hahn said he was in Lucerne Valley on or about January 31 at which time he robbed a gas station and shot a woman attendant in the head. This statement was allegedly made by Hahn to defendant in the county jail while

---

[1]"Q. [by prosecutor]: You were shown a photograph before. I want you to take a good look at the photograph, not just a quick look at it, and see if this is really the defendant's photograph or not.

"A. Well, it appears to be him, but his hair is darker in this photograph. Could be his brother. I don't know.

"Q. Is there anything else different about it, that is different about that photograph that doesn't look like the defendant?

"A. He has more than a moustache, a beard.

"Q. Is there anything else? The color of his hair is different, you said?

"A. Is darker.

"Q. Anything else about that photograph that's different from the defendant?

"A. It's a look-alike. Whether it's him I don't know."

Hahn was awaiting trial for a robbery and murder committed in Chino in which a .22 caliber pistol was used.

The trial court ruled that evidence of charges against Gary Hahn which had not resulted in convictions would be inadmissible. Defense counsel said the statements made by Hahn to defendant should be admitted as declarations against penal interest. The court ruled that these statements were inadmissible because there was insufficient proof of trustworthiness. This last ruling is challenged on this appeal.

■ A defendant may prove his innocence by evidence showing the crimes were committed by a third party but this evidence is subject to restrictions. For example, evidence of a third person's motive to commit the crime simply affords a possible ground of suspicion and is not admissible unless coupled with substantial evidence tending to directly connect that person with the actual commission of the offense. (*People* v. *Green* (1980) 27 Cal.3d 1, 22 [164 Cal.Rptr. 1, 609 P.2d 468.) Under Evidence Code section 352, a trial court may exclude evidence showing that similar crimes were committed by a third party near the time and place of the charged offenses if the court finds the evidence "has minimal probative value in comparison with its potential for uselessly prolonging a trial and confusing the issues." (*People* v. *Perry* (1980) 104 Cal.App.3d 268, 270 [163 Cal.Rptr. 522].) Evidence offered to show the guilt of a third person is not admissible unless it affords "more than a possible ground of possible suspicion." (*People* v. *Arline* (1970) 13 Cal.App.3d 200, 204 [91 Cal.Rptr. 520].)

The case most directly in point is *People* v. *Chapman* (1975) 50 Cal.App.3d 872 [123 Cal.Rptr. 862]. The defendant was charged with the murder of a man who was beaten and shot. Three witnesses said the crime was committed by two men and one witness identified defendant as one of the two. Testifying at trial, defendant said he had simply been trying to break up a fight between the victim and the third person whom he identified as Napolean Banks. In a hearing out of the jury's presence, Banks invoked the privilege against self-incrimination. Three proposed defense witnesses testified to statements allegedly made by Banks in which he said he shot the victim while defendant was trying to break up the fight. Two of the witnesses were defendant's fellow inmates at the jail and the third was defendant's uncle. The prosecutor countered with evidence of statements by Banks that he "would take the beef because he is going to the YA and he couldn't get hurt" and that defendant had threatened to "get him" if he refused to testify falsely on defendant's behalf. The trial court ruled all this evidence inadmissible and defendant was convicted of second degree murder.

■ On the defendant's appeal, the reviewing court said declarations against penal interest (see Evid. Code, § 1230) are admissible only upon a preliminary determination of trustworthiness. In making the determination, "the judge may take into account not just the words uttered" but also "the circumstances under which the declaration was uttered" and "the possible motivation of the declarant and his relationship to the defendant on the case." (*People* v. *Chapman, supra,* 50 Cal.App.3d at p. 879, fn. omitted.)

The court said the record strongly suggested "the existence of a plan by three fellow prisoners to have one person take the blame for another's crime under circumstances where the one taking the blame could not suffer any real detriment to his own interests." (*People* v. *Chapman, supra,* 50 Cal.App.3d at p. 880.) The court also held the ruling to be proper under Evidence Code section 352 because the probative value of the evidence was outweighed by the possibility of confusing the issues and misleading the jury. (*Id.,* at p. 881.)

Not as directly in point, but still highly pertinent, is *People* v. *Love* (1977) 75 Cal.App.3d 928 [142 Cal.Rptr. 532], in which the hearsay confession of a third party was offered as a prior inconsistent statement rather than a declaration against penal interest. Holding that the evidence was properly excluded, the court said: "A trial court, as a matter of law, does not abuse its discretion because the evidence rejected under Evidence Code section 352 consists of testimony about a prior inconsistent statement of a third party in which he confessed committing the crime charged against the defendant." (*People* v. *Love, supra,* at p. 939.) The court noted that the proposed testimony "was itself not clothed with internal indications of veracity and did not correlate closely with even the defense evidence in the case." (*Id.,* at p. 940.)

■ In the present case, nothing in the offer of proof concerning defendant's proposed testimony provided an internal indication of veracity. As the proposed testimony was to come from defendant himself it was highly suspect both because defendant had a motive to falsify and because accurate details concerning the crime could be explained by defendant's own knowledge and guilt rather than Hahn's. Catherine Long's misidentification of a photograph of Hahn as being a photograph of defendant was some slight corroboration but insufficient to establish trustworthiness as a matter of law. The trial court's finding that the proposed testimony lacked trustworthiness is reasonable in light of the evidence and the exclusion of the proposed testimony was not error.

## II

■ On February 24, 1984, Gary Hahn signed a declaration under penalty of perjury in which he confessed to the robbery and shooting of Cath-

erine Long. He said he arrived at the gas station between 7:30 and 8 a.m. in a blue-green 1964 El Camino. The attendant, a middle-aged woman, asked if he had found a job yet. He didn't know what she was talking about because he hadn't ever met her before. He followed her into the office, took a .22 caliber pistol from his pocket, and told her to sit down. The woman's dog got up and he thought it would attack him. The pistol discharged. He took approximately $200 from the cash register and from a shelf under the register. He told these things to defendant when they were incarcerated together. He had wanted to testify at defendant's trial but his attorney had advised him not to. He was no longer represented by an attorney and was willing to testify.

This declaration was included in a petition for writ of habeas corpus filed by defendant in this court on July 11, 1984. In the petition defendant asked that his conviction be set aside and a new trial granted. On August 1, this court appointed a referee to hold an evidentiary hearing to determine whether it appeared probable that Gary Hahn actually committed the crimes for which defendant was convicted. The referee was the judge who presided over defendant's trial.

The hearing was held on November 21, 1984. Gary Hahn was called as a witness but he invoked the privilege against self-incrimination and refused to answer any questions relating to the crimes of which defendant was convicted. Defendant did not call any other witnesses. The prosecution called Vincent Smith but he also invoked the privilege against self-incrimination. William Sheble, a sheriff's deputy assigned to the jail, then testified to a conversation with Vincent Smith on November 15, 1984. Smith said he had been in a cell with defendant and Gary Hahn 18 months earlier. Defendant wanted Smith to testify he had heard Hahn confess to the crimes with which defendant was charged. Defendant offered Hahn money if Hahn would falsely confess to defendant's crimes. The money was to come from a personal injury action to be filed by defendant against the county for a slip-and-fall injury defendant allegedly suffered in the jail. This testimony was corroborated by certified copies of a personal injury complaint filed by defendant in propria persona.

William Quintard, a sheriff's deputy, also testified for the prosecution. He said he interviewed Gary Hahn on October 17, 1984. He asked Hahn to draw a map showing the location of Catherine Long's gas station. The map which Hahn drew put the gas station someplace in Hesperia, about 25 miles from its actual location in Lucerne Valley. Gary Hahn said he did not purchase gas at the station but only cigarettes. He said he took the money from a drawer and he did not mention a suitcase. Hahn refused to say where he was or whom he was with during the days before and after the shooting of

Catherine Long. He refused to say where he obtained the 1964 El Camino mentioned in the declaration and he said he sold it in Oregon in February 1983. He also said he believed his life was in danger in the prison system because he was known as a snitch.[2]

The prosecution introduced documentary evidence showing Gary Hahn had been convicted of robbery in 1973, vehicle theft in 1969, and forgery in 1967. Hahn was then serving a sentence of life without possibility of parole for a robbery-murder committed on January 21, 1983. Hahn was convicted of these offenses by jury verdict on November 11, 1983.[3]

On December 7, 1984, the referee's findings were filed in this court. The referee found that Gary Hahn is not a credible witness, his purported confession is untrustworthy and not believable, and there is no credible evidence to support defendant's claim that Gary Hahn committed the offenses of which defendant stands convicted.

The evidence at the hearing, considered in light of the evidence presented at defendant's trial, abundantly supports the findings of the referee. The evidence against defendant was overwhelming and virtually conclusive. Hahn's confession is not believable and there is no credible evidence connecting him to the crimes of which defendant was convicted. The petition for writ of habeas corpus will be denied.

### III

Defendant sent a personal communication to this court requesting review of the enhancement of his sentence for a prior serious felony conviction. (Pen. Code, § 667.) We subsequently requested and received from the parties additional briefing on this point. Having reviewed the issue, we conclude that the enhancement is proper.

At trial the prosecution introduced evidence showing defendant was convicted of murder in the State of Wyoming on April 22, 1966, as alleged in the information. The probation report lists defendant's date of birth as March 18, 1950, and lists the date of the murder in Wyoming as October 23, 1965, which would make defendant 15 years old at the time of the offense.

■ In California, both in 1965 and at the present time, a person cannot be tried as an adult for a felony committed while under the age of 16 years.

---

[2] The prosecution theorized that Hahn hoped to prove himself to the prison population and eliminate the threat to his life by confessing falsely to defendant's crimes.

[3] Comparison of the probation reports of defendant and Hahn reveals that while defendant is six feet, two and one-half inches tall, Gary Hahn is only five feet, eight inches tall.

Criminal acts by persons under the age of 16 years fall within the exclusive jurisdiction of the juvenile court. (Welf. & Inst. Code, §§ 607, 707. See 40 Ops. Cal.Atty.Gen. 83 (1962).) However, the juvenile court is empowered to determine that a minor "16 years of age or older" is not a fit and proper subject to be dealt with under the Juvenile Court Law. (Welf. & Inst. § 707.) If such a finding of unfitness is made, the minor may be certified to a court of criminal jurisdiction for criminal prosecution instead of juvenile adjudication. (Welf. & Inst., § 707, subds. (a) & (b).) In such a case, the juvenile may suffer a "felony conviction." (*People* v. *West* (1984) 154 Cal.App.3d 100, 108 [201 Cal.Rptr. 63].)

█ In view of the foregoing, defendant urges that "the section 667 enhancement . . . must be reversed since [defendant] at 15 years of age was not of age to be subject to a California criminal proceeding and his Wyoming conviction may not therefore be considered as a 'prior felony conviction' within the meaning of Article I, section 28, subd. (f)." We disagree.

In June of 1982, the voters added article I, section 28 (the "Victims' Bill of Rights") to the state Constitution. Subdivision (f), of article I, section 28, provides in relevant part: "Any prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, shall subsequently be used without limitation for purposes of . . . enhancement of sentence in any criminal proceeding." Insofar as it applies to juveniles, this section has been narrowly construed to apply only to those minors who have been found unfit for juvenile adjudication, and who subsequently undergo criminal prosecution and conviction. (*People* v. *West, supra,* 154 Cal.App.3d 100; *In re Anthony R.* (1984) 154 Cal.App.3d 772 [201 Cal.Rptr. 299]. But see *In re Javier A.* (1984) 159 Cal.App.3d 913, 964, fn. 46 [206 Cal.Rptr. 386].)

We agree with the conclusion of the court in *In re Anthony R., supra,* that "the Victims' Bill of Rights did not intend to transform juvenile adjudications into criminal convictions. . . ." (154 Cal.App.3d at p. 777.) We further agree with the court in *People* v. *West, supra,* "that article I, section 28, subdivision (f), permits the unlimited use of prior felony *convictions* for enhancement purposes, whether the person convicted was an adult or juvenile being tried as an adult at the time of the prior conviction." (154 Cal.App.3d at p. 110.)

For purposes of this discussion, however, the emphasis in the above-quoted sentence should be on "unlimited." For the sweep of section 28, subdivision (f), is all-inclusive. It includes all juveniles tried and convicted as adults. There is *no exception provided in the Constitution, either express or implied, for juveniles whose prior felony convictions occurred in other states for crimes committed before the juvenile had attained California's*

*statutory minimum age of 16. Provided the juvenile has been tried and convicted as an adult, the Constitution provides that no limitations shall be* set on the use of the prior felony conviction for purposes of enhancement. We presume that the voters meant what they said, and therefore decline to read into the Constitution a minimum age restriction in the use of prior felony convictions. (*In re Kenneth H.* (1983) 33 Cal.3d 616, 619, fn. 3 [189 Cal.Rptr. 867, 659 P.2d 1156].) We conclude that article I, section 28, subdivision (f), applies to *any* person who has been convicted of a prior felony, here or in any other jurisdiction, regardless of his or her age at the time of the prior offense.

■ It has been suggested, however, that imposition of an enhancement for a crime committed when the defendant was 15 years of age would constitute unequal protection of the law. ■ "The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." (*In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549].) The *purpose* of the classification is the key to understanding whether two "similarly situated" groups are receiving unequal treatment. (See Tussman & tenBroek, *The Equal Protection of the Laws* (1949) 37 Cal.L.Rev. 341, 346.) "The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the *legitimate purpose of the law* receive like treatment." (*Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194]; *In re Gary W.* (1971) 5 Cal.3d 296, 303 [96 Cal.Rptr. 1, 486 P.2d 1201]; italics supplied.)

■ In distinguishing, for purposes of enhancement, between juveniles deemed fit for treatment in juvenile court and those found unsuitable for such treatment, i.e., those subject to prosecution and conviction as adults, the Victims' Bill of Rights evinces a clear and well-established purpose. It is well-settled that "[a]dults convicted in the criminal courts and sentenced to prison and youths adjudged wards of the juvenile courts and committed to the Youth Authority are not 'similarly situated.'" (*In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549].) The state does not have the same purpose in adjudicating certain juveniles to be wards of the court that it has in prosecuting and convicting other juveniles as adults. The purpose of juvenile adjudication is to protect and rehabilitate the offender; the purpose of criminal prosecution is to punish the individual and protect society. (*In re Eric J., supra,* 25 Cal.3d at p. 531; *In re Aline D.* (1975) 14 Cal.3d 557, 567 [121 Cal.Rptr. 816, 536 P.2d 65].) Hence article I, section 28, subdivision (f), serves a rational and well-established purpose in shielding from the enhancement statutes those juveniles deemed fit for rehabilitation and protection while simultaneously exposing to the risk of

sentence enhancement those juveniles deemed suitable for prosecution and punishment as adults.

We cannot say that article I, section 28, subdivision (f), lacks a rational purpose or that the classification is arbitrary.[4]

The fact that two juveniles of the same age may be treated differently under the law is immaterial. The provision at issue here defines two classes of minors: Those adjudicated as juveniles and adjudged to be wards of the court, and those prosecuted as adults and convicted of felonies. The purpose of the law is to protect the former by insulating them from sentence enhancement, and to punish the latter by exposing them to the same risk. Thus the two minors of similar years are *not similarly situated* "with respect to the legitimate purpose of the law." (*In re Eric J., supra,* 25 Cal.3d at p. 531.)

Nor is it relevant for purposes of equal protection analysis that a 15-year-old who murders in Wyoming may be tried as an adult and "convicted" of a felony for purposes of sentence enhancement, while a 15-year-old who murders in California may not be tried as an adult or suffer a "conviction" within the meaning of article I, section 28, subdivision (f). Again, the purpose of the classification determines whether it has a basis in reason. The purpose of the provision here is to punish those deemed unfit for the special protections of the juvenile court; it matters not that the crime was committed by one presumed *in California* to be fit for such protection, but rather that a court of law in a coordinate jurisdiction decided that *this defendant* was not suitable for the special immunities of the juvenile court law. California may respect Wyoming's determination that defendant was a proper candidate for conviction and punishment, in order to accomplish the legitimate objectives of our own state, as expressed by the voters through enactment of article I, section 28, subdivision (f). That purpose, as earlier noted, can only be fully effectuated by subjecting *all* juveniles convicted of felonies as an adult to the operation of the law.

The equal protection argument is meritless.

---

[4]"The instant case does not involve any *suspect* classification. Nor does it involve a *classification* impinging upon fundamental interests.[2] Consequently, the equal protection standard employed is the *rational basis* test. . . .

"[2]This does not imply that liberty is not a fundamental interest. (*People* v. *Olivas* (1976) 17 Cal.3d 236, 250-251 [131 Cal.Rptr. 55, 551 P.2d 375].) We believe that there is a qualitative difference, however, between the initial interest one has in retaining his liberty prior to sentencing and the interest one has in whether or not an enhancement applies. . . ." (*People* v. *Hernandez* (1979) 100 Cal.App.3d 637, 644 [160 Cal.Rptr. 607].)

Indeed, the irony of defendant's position is that it would *create* an equal protection problem where none now exists. Consider for a moment the consequences were we to accept defendant's construction of article I, section 28, subdivision (f). Two defendants with the same prior out-of-state felony conviction could receive sharply divergent prison terms when sentenced on a new offense in California, solely on the arbitrary basis of their respective ages at the time of the prior offense and conviction. Each is similarly situated with respect to the plain language and purpose of the law, yet one's prior felony conviction may be used to enhance his sentence, and the other's may not. That, we suggest, would constitute a true denial of equal protection.

Finally, we note that three separate and distinct sections of the Penal Code (§§ 667, 667.5, & 668) speak to the imposition of sentence enhancements on the basis of prior out-of-state felonies. Nothing that we have said today is inconsistent with anything contained in Penal Code sections 667 or 667.5. Section 667, which applies to enhancements on the basis of prior serious felony convictions, states that an out-of-state felony must include "all of the elements of any serious felony" in California. Defendant's prior murder conviction clearly meets this definition.

Penal Code section 667.5 applies to sentence enhancements based on prior prison terms. Subdivision (f) of section 667.5 defines an out-of-state conviction as "an offense which if committed in California is punishable by imprisonment in state prison," provided that defendant actually "served one year or more in prison for the offense in the other jurisdiction." Defendant here meets both of these criteria: The "offense" was punishable in California by imprisonment in state prison, and defendant actually served a prison term in Wyoming in excess of one year.

A third definition of prior foreign convictions may be found in Penal Code section 668. That section in pertinent part provides: "Every person who has been convicted in any other state . . . of an offense for which, if committed within this state, *such person* could have been punished under the laws of this state by imprisonment in state prison. . ." may be punished as though the prior conviction had taken place in California. (Italics supplied.)

Under this section, defendant herein could not be subject to sentence enhancement. Because defendant was 15 years of age when he committed the murder in Wyoming, he was not a "person" subject to imprisonment in state prison in California.

Nevertheless, it is well settled that where statutory and constitutional provisions are in conflict, the latter must prevail. (*South. Cal. Tel. Co. v. Los*

*Angeles Co.* (1931) 212 Cal. 121, 125 [298 P. 9]; *Noce* v. *Department of Finance* (1941) 45 Cal.App.2d 5, 10 [113 P.2d 716]; *Wright* v. *Compton Unified Sch. Dist.* (1975) 46 Cal.App.3d 177, 183 [120 Cal.Rptr. 115].) To the extent section 668 imposes a limitation upon the use of defendant's prior felony conviction for enhancement purposes, it is inconsistent with article I, section 28, subdivision (f), and cannot stand. The enhancement was properly imposed.

## DISPOSITION

The judgment is affirmed.

Kaufman, Acting P. J., and McDaniel, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 15, 1985. Mosk, J., and Kaus, J., were of the opinion that the petition should be granted.